## STATE *v.* CARLTON.

### *Res Gestæ.*　*Criminal Law.*

A statement of the deceased, as to where the defendant shot him, made about two minutes after the affray, and some eleven rods from the scene thereof, was held inadmissible.

The respondent having the right to use reasonable force to expel the deceased from his premises, *held*, that he had the right to go prepared with a loaded pistol, to defend himself against any assault that the deceased might make upon him while in the exercise of that right; and that, if he only intended to use such weapon in such emergency in, defending his own life, or himself against the infliction of great bodily harm, the carrying of such weapon for such a purpose, would not be unlawful.

*Held*, also, that if the respondent was carrying the pistol for a lawful purpose, the carrying of it for such purpose was not, in itself, carelessness; and that if it was afterwards accidentally discharged in consequence of the unlawful act of the deceased, without fault on the part of the respondent, the respondent was not responsible for the consequences.

INDICTMENT for manslaughter.　Trial by jury, June Term, 1873, REDFIELD, J., presiding.

The indictment alleged that on the 5th day of June, 1872, at Vershire, in said county, one Alonzo W. Davis was shot through the body with a pistol loaded with powder and ball, held in the hand of the respondent, and that the said Davis died of the wound at ten minutes past 2 o'clock on the morning of the 6th of said June.　These allegations were not controverted by the respondent; but he claimed that Davis was shot accidentally, and without the instrumentality of respondent, during a personal encounter between him and the said Davis and his father, and that the respondent was without blame in the matter.　The affray occurred on a discontinued highway that led from the main road to the respondent's premises.　Said road led across land belonging to the respondent, and was discontinued, and a record thereof made, on the 3d of said June.　Alonzo W. Davis, the deceased, and his father, Winthrop Davis, who was a witness on the part of the state, and present at the affray, had been in the habit of passing along said road, and so across the respondent's land, to

their own residence, a mile or two distant, thus saving some distance in travel.  Some time before the shooting of said Alonzo, a difficulty had arisen between the Davises and the respondent, and he had forbidden their crossing his land, or coming upon it; and upon one occasion only a week before the affray, he had driven Winthrop Davis from his land.  On the morning of said 5th of June, the Davises passed down from their home across respondent's land, out through the then discontinued highway.  At this time the said highway was enclosed within respondent's fences, and the fence upon one side, which had formerly separated the highway from respondent's field, was removed.  On their return several hours later, when they reached the bars across the end of said road next the main highway, and were about to enter respondent's land, Winthrop Davis said to his son, "Let us go up around;" to which the son replied, "No, I am going across."  The facts so far were not disputed.

As to what occurred from the time the Davises entered the field to the time of the shooting, whenever it occurred, there were but three witnesses, to wit, Winthrop Davis on the part of the state, the respondent on his own behalf, and Benjamin F. Carlton, except the testimony of four persons who heard the shots that were fired, and noticed the time between them, and the degree of loudness as compared with one another.  The testimony on the part of the state tended to show, that as the Davises came up the main road towards the bars that open into the discontinued highway, they heard some one drilling stone, but could not see who it was; that as they approached the bars, they heard a pistol shot, and immediately after, another; that both these shots were fired before the Davises reached the bars; that as the second shot was fired, they had advanced so far towards the bars that Winthrop Davis saw their dog jump upon the stone wall south of the discontinued highway, and jump over it with a yelp; that at the same time he saw the respondent advancing from the rock where he had been drilling, towards the discontinued highway, with a pistol in one hand and a cane or goad-stick in the other; that the rock was about ten rods from the discontinued highway, and that the respondent was about half way from the rock to said highway;

that Alonzo W. Davis slipped one of the bars and stepped over into said highway, and Winthrop Davis stepped over after him, and put up the bar behind him ; that the respondent advanced towards Alonzo at the same time Alonzo advanced towards him ; that as respondent advanced, he changed his pistol from his right hand to his left, and took his stick in his right hand ; that he held his pistol pointing towards Alonzo, and when he came near enough to him he struck him with the stick ; that Alonzo immediately turned to his father and said, " Father, he has shot me ! " and then turned back to the respondent and clinched him, and after a short scuffle, threw him to the ground near the stone wall south of the road, on which they were standing ; that Winthrop Davis was within two rods of the parties when respondent struck Alonzo, and was within ten feet when respondent was thrown to the ground ; that Winthrop Davis did not hear the third shot, nor see the flash of the pistol, nor the smoke ; that as Alonzo threw respondent, respondent fell upon his back, and that Winthrop Davis saw the pistol still in respondent's left hand ; that the pistol was a Smith & Wesson's six-cartridge revolver, loaded with fixed ammunition ; that the witness, Winthrop Davis, stepped by the side of respondent, took hold of the pistol and turned it away from the persons of respondent and Alonzo, towards the wall, and attempted to take it from respondent.

While this struggle was going on, it appeared from the testimony of one Johnson, a witness produced on the part of the state, that he was sitting in his house, seven rods from where Alonzo threw respondent to the ground, facing two windows looking out upon the discontinued highway ; that he heard the first report of the pistol, and looked up, but noticed nothing ; that immediately after, he heard the second report, and then saw the dog going over the wall, and the heads of the Davises over the wall, and that he immediately started for the scene of the affray. To reach the spot, he had to go through a long entry in his house, and through said bars, a distance by measurement of 11 32-100 rods. While passing through the entry, his wife met him, and endeavored to prevent his going, and some little time was spent, but how much did not appear. Johnson did not hear the third

pistol shot. When he reached the scene of the affray, respondent lay upon his back, with Alonzo over him, but upon his feet, with his hands reached down towards respondent. Winthrop Davis had hold of the pistol, trying to take it from respondent. Johnson immediately took hold of Winthrop Davis, and tried to take him away, but did not succeed the first time. Upon respondent's calling upon him to take Davis off, Johnson took hold of Winthrop Davis again, and succeeded in taking him away, and immediately Alonzo and respondent got upon their feet. As to what occurred after the parties got upon their feet, the testimony of the state's witnesses did not agree precisely. The testimony of said Johnson was, that as the parties rose to their feet, Winthrop Davis went towards Johnson in a threatening attitude, and Johnson warned him to keep off; that Davis then said, " All I want is the pistol." At or about the same time, the respondent said to the Davises, " Get out of my field "; and Alonzo said to Johnson, " Be still, Johnson, I am wounded!" and pulled up his vest, and Johnson saw blood. Respondent said again, " Get out of my field," and Alonso said, " Let me get my cap," and picked up his cap, which lay in the discontinued road a few feet nearer Carlton's house than where Alonzo stood when he spoke ; Johnson and Alonzo then started towards Johnson's house by way of the bars. They had gone but a short distance towards the bars, when Alonzo turned and said to his father, " Father, I am wounded, and badly!" He repeated this at the bars, both before and after he got over them. Alonzo also said, " Get the doctor," and repeated it several times. Johnson and Alonzo went to Johnson's house, where Alonzo sat down in the front door-way, while Johnson went to catch his horse to go for the doctor. As Johnson came back with his horse, Alonzo still sat in the doorway, and his father stood by him with a cup in his hand. Johnson then went for the doctor. These facts in relation to Alonzo's being in the doorway, and his father's standing by him with a cup in his hand, were called out on the cross-examination of Johnson.

It appeared from the testimony of Winthrop Davis, that after Alonzo and Johnson had gone from the field, Carlton drove him from the field, striking and pushing him with the stick, and kick-

ing him, but he denied that there was any talk between him and
Carlton. He also testified that he went from the field immedi-
ately into Johnson's house, and found Alonzo on the lounge, and
that from the time Alonzo got up in the field after the scuffle on
the ground, to the time the witness went into the house, was not
more than two minutes; that while Alonzo lay on the lounge, he
said he felt faint, and the witness got him something to take. At
this point, the counsel for the prosecution offered to show what
Alonzo said, claiming it to be admissible as a part of the *res gestœ*.
To this the respondent objected. The court desired time to con-
sider. The witness stated still further, that he got Alonzo some
camphor, but before he got it, he asked him where he was hit,
and Alonzo pulled up his vest and showed him. One of the gar-
ments was burning, but the witness could not say whether the
shirt or vest, and he put the fire out with his thumb and fin-
ger. Afterwards, he gave him some camphor and peppermint.

The next morning after Winthrop Davis testified, the court
decided to admit the testimony as to the statement made by
Alonzo referred to above, and Winthrop Davis was recalled and
testified, under objection, that when he got into the house,
Alonzo, while lying on the lounge, showed him where he was
shot, and when the witness was putting out the fire, Alonzo said,
" He shot me before I touched him." This was before the doctor
got there. To the admission of this evidence the respondent
excepted.

On the part of the respondent the testimony tended to show
that the Davises had insisted upon crossing respondent's land
against his express wishes; that at the time of the affray they
reached the bars at the end of said cross-road together, and got over
nearly together, Alonzo being a little in advance of his father,
and that their dog ran under the fence just ahead of them, and
was without a collar; that Carlton fired his revolver at the dog
when he stood within a few feet of the north side of the road, and
the dog stood upon the road; that he did not hit the dog, but
immediately stepped to the edge of the road and fired at it again,
just as it was about to jump upon the wall; that he brought his
hand to his side, and, he thought, cocked his pistol again, but was

State *v.* Carlton.

not certain, and the dog went over the wall, making an outcry; that he immediately stepped into the road and faced the Davises, who were approaching him nearly side by side, and about three feet apart; that as he faced them, they were about a rod and a half from him, and he ordered them out of his field, and changed his revolver from his right hand to his left, and held it by his side, and took the stick in his right hand; that as Alonzo came upon him, respondent struck him a smart blow upon his right shoulder; that respondent sprang back, raised the stick to strike another blow at the other shoulder, but before he could see the blow fall, his hat was knocked over his eyes, and he was grappled firmly by both shoulders, and after a short struggle, thrown to the ground upon his back, with his head near the wall at the south side of the road, and his feet towards the road. The testimony for the respondent tended to show, that the third shot was not fired while standing up, but while on the ground.

It was claimed and argued on the part of the respondent, that the shooting could not have happened when the parties were erect, not only from the position and direction of the wound, but also from the time that elapsed between the second and third shots, and that it must have occurred during the struggle upon the ground, and was entirely accidental, and without blame on the part of the respondent. Counsel for respondent requested the court to charge the jury that,

1. "Having changed the pistol from his right hand to his left hand on appearance of an impending attack upon him by the deceased and his father, the respondent was guilty of no negligence in not dispossessing himself of the pistol by throwing it aside, if he feared, or had reasonable ground of apprehension, that it would thus fall into the hands of the elder Davis, and his own safety be endangered thereby.

2. If under the circumstances the pistol was accidentally discharged in the scuffle between the deceased and the respondent, by means of which the deceased came to his death, there was no positive misconduct on the part of the respondent—the death was by misadventure merely, and a conviction of manslaughter is not justifiable."

The court refused to charge as requested, but charged, among other things, as follows:

Although the respondent had the right to expel intrusion from his own premises by reasonable force, he had no right to resort to a deadly weapon. The law regards human life so much superior to property, that it does not allow the endangering of life for the purpose of regaining title to property, or redressing such grievances. And we charge you, that if he took the pistol, loaded and in condition to be used, and voluntarily took part in the conflict, put himself in position, expecting it, prepared for it, and entered upon it voluntarily, and had that pistol with the intent and design to use it in any emergency that might arise,— for instance, in case he was not successful with his cane, or if he was in danger of being overcome, or in any event, when he entered into the conflict voluntarily, and purposed to use it in any emergency that should arise, that he would become, by resorting to a deadly weapon, the aggressor; to enter upon the conflict, if he entered upon it voluntarily, he would be responsible for the result ; if by any accident life was destroyed, he would be responsible for the result, though not designed. Upon the other point, we charge you, that though he had a right to remove him by reasonable means, yet if he resorted to means that were dangerous, and by any gross carelessness in having about him fire-arms in preparation for discharge, though he did not intend to use it in any manner, if by gross carelessness, life was destroyed, he would be responsible for the result of his carelessness; and it would be manslaughter in any event, if Alonzo W. Davis was killed in consequence of gross carelessness on the part of the respondent.

To the refusal to charge as requested, and to the charge as given, respondent excepted.

*R. Farnham* and *C. W. Clarke*, for respondent.

*N. L. Boyden*, state's attorney, (*J. W. Rowell* with him), for the state.

The opinion of the court was delivered by

ROYCE, J. The first exception taken on the trial was to the admission as evidence of the declaration of Alonzo W. Davis, made to the witness Winthrop Davis, that " he (meaning the respondent) shot me before I touched him." This declaration was admitted as a part of the *res gestæ*. It is frequently difficult to

determine when, and under what circumstances, matter offered as evidence is admissible as a part of the *res gestæ.* But it is well settled in this state, that to make such matter admissible, it must have been concurrent with the act or transaction in issue and a part of it, and that a narrative of a transaction completed and finished when the narrative is given, though made while fresh in memory, and so soon after that the party had not time, probably, to imagine or concoct a false account, is inadmissible. *Warden* v. *Powers,* 37 Vt. 619 ; *Downer and Wife* v. *Strafford,* 47 Vt. 579 ; and see *Luby and Wife* v. *Hudson R. R. Co.* 17 N. Y. 131; and *Enos* v. *Tuttle,* 3 Conn. 250, and *Russell* v. *Frisbie,* 19 Conn. 205. This is the rule which has prevailed in civil cases. In *State* v. *Davidson,* 30 Vt. 377, in the opinion delivered by Ch. J. REDFIELD, he says : " The declarations of a party injured when no one is present, are not evidence to show the manner in which the injury occurred, however nearly contemporaneous with the occurrence ; and it clearly would not have been competent to show that Baldwin [the party that the respondent was charged with robbing] said when first discovered, that he had been robbed by the respondent." The declaration of Alonzo W. Davis that was given in evidence was no part of the act or transaction from which his death resulted. That was finished and ended some time previous to the making of the declaration. And it was not so connected with and a part of the act or transaction as to make it admissible. The wisdom and justice of this rule in the administration of criminal law must be apparent. The general rule is, that no evidence can be received against a prisoner except such as is taken in his presence. McNally's Pleas of the Crown, 261. And the exception that is made in admitting dying declarations, is upon the theory that when made, every motive to falsehood is silent, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice. To make a further exception, and admit the declarations of the party injured, made in the absence of the party accused, and without the right of cross-examination, at a period of time so

far subsequent to the happening of the act or transaction about which the declarations are made that the party *might* have invented them, would be depriving the accused of one of the important safeguards which the law has given him for his protection.

In passing upon the question as to whether there was error in the charge, the requests and charge have to be considered in connection with the facts which were developed by the evidence. It was conceded that at the time of the affray that resulted in Alonzo W. Davis's death, he and the witness Winthrop Davis were trespassing upon the respondent's land, and that the respondent had the right to expel them therefrom by the use of reasonable force. The respondent's evidence tended to show that while he was endeavoring to expel them from his land by the use of reasonable force, he was assaulted by Alonzo W. Davis, and thrown by him upon the ground, and that while he was lying upon the ground with Alonzo W. Davis on top of him, the loaded pistol, which he had all the time during the conflict held in his left hand, was accidentally discharged into the body of Alonzo W. Davis, inflicting the wound which caused his death. The counsel for the respondent requested the court to charge the jury that if the pistol was discharged in that manner, and the death of Alonzo W. Davis was caused thereby, there was no positive misconduct on the part of the respondent—the death was by misadventure merely, and a conviction of manslaughter was not justifiable. The court, upon the subject-matter of this request, charged, that " if the respondent took the pistol, loaded and in condition to be used, and voluntarily took part in the conflict, put himself in position, expecting it, prepared for it, and entered upon it voluntarily, and had the pistol with the intent and design to use it in any emergency that might arise—for instance, in case he was not successful with his cane, or if he was in danger of being overcome, or in any event —when he went into the conflict voluntarily, and prepared to use it in any emergency that should arise, that he would become, by resorting to a deadly weapon, the aggressor ; to enter upon the conflict, if he entered upon it voluntarily, he would be responsible for the result if by any accident life was destroyed ; he would be responsible for the result, though not designed." We think

this instruction to the jury was erroneous.  The respondent having the right to use reasonable force in expelling Alonzo W. Davis and Winthrop Davis, he had the right to go prepared to defend himself against any assault that they might make upon him while in the exercise of that right ; and if he only intended to use the pistol in such an emergency in defending his own life, or against the infliction of great bodily harm, the carrying it for such a purpose would be lawful.  Resort must be had to the evidence, to ascertain the sense in which the word *conflict* is used in the exceptions and charge.  The evidence on the part of the respondent tended to show that on his part, it was at its commencement a contest, or strife, conducted on his part in a lawful manner, to expel Alonzo W. and Winthrop Davis from his land.  We do not understand that the carrying a deadly weapon upon entering into such a conflict, would, as matter of law, make the party carrying it the aggressor ; and his responsibility, if by any accident life was destroyed in consequence of his carrying it, would depend upon other considerations than his carrying the weapon upon entering into such a conflict.  The court further charged the jury, " that if by any gross carelessness in having about him fire-arms in preparation for discharge, though he did not intend to use it in any manner, if by gross carelessness life was destroyed, he would be responsible for the result of his carelessness, and it would be manslaughter in any event if Alonzo W. Davis was killed in consequence of gross carelessness on the part of the respondent."  As an abstract proposition, this portion of the charge is unexceptionable ; but as applicable to this case it was erroneous.  We have already seen that under certain circumstances the pistol might have been lawfully carried into the conflict, and if lawfully carried, it was not carelessness in the party carrying it ; and yet the jury might have found, from the language of the charge, that the act of carrying it into the conflict for any purpose, was gross carelessness.  The respondent's evidence tended to show, that while he was endeavoring to expel Alonzo W. Davis from his land in a lawful manner, that Alonzo made an unlawful assault upon him, and that the pistol was discharged in consequence of such assault.  The court should have charged the jury

that if the respondent was carrying the pistol for a lawful purpose, the carrying it for such a purpose was not in itself carelessness ; and if it was afterwards accidentally discharged in consequence of the unlawful act of Alonzo, and without fault on the part of the respondent, he was not responsible for the consequences. In the above particulars we do not think the charge was as favorable to the respondent as it should have been. Some other exceptions were taken on the trial, but they have not been urged in this court, and hence we have not examined them with as much care as we should have done if they had been insisted upon in argument. From the examination we have given them, we have discovered no error in the rulings of the court, except in the matters indicated.

The exceptions are sustained, verdict set aside, and new trial granted.